## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**LONG BEACH MEMORIAL MEDICAL
CENTER**
dba Long Beach Memorial Medical Center
2801 Atlantic Avenue
Long Beach, CA 90806

**LONG BEACH MEMORIAL MEDICAL
CENTER**
dba Community Hospital Long Beach
1720 Termino Avenue
Long Beach, CA 90804

**SADDLEBACK MEMORIAL MEDICAL
CENTER**
24451 Health Center Drive
Laguna Hills, CA 92653

**ORANGE COAST MEMORIAL MEDICAL
CENTER**
9920 Talbert Avenue
Fountain Valley, CA 92708

Civil Action No.:

                                                  Plaintiffs,

              v.

**SYLVIA M. BURWELL**, Secretary,
United States Department of
Health and Human Services
200 Independence Avenue S.W.
Washington, D.C.  20201,

                                                  Defendant.

## COMPLAINT

The above-captioned four Plaintiff hospitals (the "Providers"), by and through their

undersigned attorneys, bring this action against defendant Sylvia M. Burwell, in her official

capacity as the Secretary ("the Secretary") of the Department of Health and Human Services ("HHS"), and state as follows:

## INTRODUCTION

1.      This action arises under Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.* ("the Medicare Act"), and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq.*  This action concerns the Secretary's implementation of an across-the-board rate reduction for reimbursement for inpatient hospital services to hospitals that serve Medicare beneficiaries. The Secretary promulgated regulations, purportedly to clarify the standards the Medicare program will use to determine whether a patient should be admitted to a hospital as an inpatient or treated as an outpatient.  Under the guise of offsetting dubiously predicted increases in overall Medicare program costs due to the new standards, the Secretary implemented a Medicare payment rate reduction that will cause the nation's already fiscally squeezed hospitals considerable financial loss.

2.      Specifically, the Secretary, through a procedurally and substantively flawed rulemaking, implemented a 0.2% reduction to the Medicare Inpatient Prospective Payment System ("IPPS") rates for inpatient discharges at all IPPS hospitals, including the Providers, occurring on and after October 1, 2013, as set forth by the Centers for Medicare and Medicaid Services ("CMS"), in the Federal Fiscal Year ("FFY") 2014 IPPS Final Rule (the "Final Rule"). *See* 78 Fed. Reg. 50,496 (Aug. 19, 2013).

3.      The new policy that CMS adopted in the Final Rule presumes that (a) inpatient admissions are appropriate if the beneficiary's inpatient stay extends past two midnights and (b) stays shorter than two midnights that do not involve services designated by CMS as "inpatient only" are "generally inappropriate for payment under Part A" as inpatient services, and should be provided as outpatient services, unless there is clear physician documentation in the medical

record supporting the physician's order and expectation that the beneficiary would require care spanning at least two midnights (even though this ultimately did not occur). This is commonly referred to as the "two-midnight" policy.

4.      The Secretary estimated in the Final Rule that this new policy would result in a net shift of 40,000 patient encounters from outpatient departments to inpatient care, and surmised that this would cause IPPS expenditures to increase by approximately $220 million for FFY 2014 and subsequent periods. However, CMS provided very little support for these predictions, and the little support it did supply shows the predictions to be unjustifiable and inaccurate. Based on the problematic assumption, the Secretary took the extremely rare step of using CMS's special statutory "exceptions and adjustments" authority to reduce all IPPS payments by 0.2% for FFY 2014 and thereafter to offset the expected annual $220 million total increase in Medicare inpatient reimbursement under IPPS.

5.      The Secretary's actions are substantively and procedurally flawed. The Secretary had no valid statutory authority to implement the rate cut. Furthermore, the Secretary implemented the rate cut in a way that violates the express terms of the very statute that she claims authorizes the rate cut. The Secretary failed to provide sufficient support for her actions in both the Proposed and Final Rules, depriving the Providers and other affected parties of meaningful notice and comment, and rendering the 0.2% reduction arbitrary, capricious, and lacking in substantial evidence. The little explanation that was provided shows that the Secretary's calculations were based on incomplete data and unsound methodologies, resulting in faulty predictions. The Providers estimate that the 0.2% rate cut will cause them an aggregate loss of approximately $334,000 in FFY 2014 alone.

6.      The Providers are all Medicare participating hospitals that stand to suffer

significant financial losses if the Secretary's arbitrary payment reduction is not set aside and the

effects thereof reversed.

7.      The Providers, thus, ask the Court to: (a) declare the 0.2% reduction to be invalid;

(b) set aside the portion of the Final Rule setting forth the 0.2% reduction; (c) order the Secretary

to instruct the Providers' Medicare administrative contractors to make FFY 2014 and future IPPS

payments to the Providers without applying the 0.2% reduction; and (d) order the Secretary to

instruct the Providers' administrative contractors to make FFY 2014 and future IPPS payments

to the Providers with appropriate increases.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction under 42 U.S.C. § 1395oo(f) (appeal of final Medicare

program agency action) and 28 U.S.C §§ 1331 and 1361.

9.      Venue lies in this judicial district under 42 U.S.C. § 1395oo(f)(1) and 28 U.S.C.

§ 1391.

## PARTIES

10.     During the fiscal period at issue herein, Plaintiffs were qualified as providers of

hospital services under the federal Medicare Program pursuant to Title XVIII of the Social

Security Act, 42 U.S.C. Sections 1395 *et seq.*  The plaintiff hospitals with their Medicare

provider numbers are set forth in Exhibit 1, which is the "schedule of providers" from the

underlying administrative appeals.  On the schedule of providers, the plaintiff hospitals usually

are listed by their "dba" only and can be identified definitively by their Medicare provider

numbers.  As shown in the schedule of providers, the hospitals' fiscal year end dates sometimes

are not the same as the federal fiscal year.  One federal fiscal year may overlap with two hospital

fiscal years.  If so, then only a portion of each hospital's fiscal years fall within the federal fiscal

year that is the subject of this lawsuit.  For example, if a hospital's fiscal year ends on June 30, then the periods from October 1, 2013 through June 30, 2014, and July 1, 2014 through September 30, 2014, fall within federal fiscal year 2014 and would be included in this lawsuit. As such, it would affect the provider's fiscal years ending June 30, 2014, and June 30, 2015, which is why both years would be listed on the schedule of providers.

11.     Defendant Sylvia M. Burwell is the Secretary of the Department of Health and Human Services, the federal department which contains CMS.  The Secretary, the federal official responsible for administration of the Medicare Program, has delegated the responsibility to administer that program to CMS.

## THE MEDICARE PROGRAM

12.     The Medicare Act establishes a system of health insurance for the aged and disabled.  42 U.S.C. § 1395c.  Plaintiffs entered into written agreements with the Secretary to provide hospital services to Medicare-eligible individuals as "providers of services" under the Medicare Act.  42 U.S.C. § 1395cc.

13.     The Medicare program is federally funded and is administered by the Secretary through CMS and its contractors.  42 U.S.C. § 1395kk; 42 Fed. Reg. 13,202 (Mar. 9, 1977).

14.     The Medicare program is divided into five parts: A, B, C, D, and E.  At issue in this case are Parts A and B.  Part A of the Medicare program provides payment for, among others, inpatient hospital services. 42 U.S.C. §§ 1395c *et seq*.  Under IPPS, which Congress enacted in 1983, hospitals are reimbursed for inpatient services at a fixed amount for each Medicare patient discharged from the hospital according to a prospectively determined payment rate.  A hospital is entitled to be reimbursed a different payment amount according to the classification of the Medicare beneficiary's condition into one of many diagnosis related groups ("DRGs").  42 U.S.C. § 1395(d)(1)-(2).  The DRG payment rates generally apply without regard

to the cost of services rendered to the particular Medicare beneficiary patient.

15.     Medicare participating hospitals may be eligible for certain supplemental and add-on payments, beyond the basic DRG-based payments that are available under IPPS.  Such add-ons include, but are not limited to, payments for direct and indirect costs related to training medical residents (also known as "Direct Graduate Medical Education" costs and "Indirect Graduate Medical Education" costs), payments for beneficiaries' non-payment of co-payments (also known as "Bad Debts"), payments to hospitals that serve a disproportionate share of low-income patients (known as "Disproportional Share Hospitals"), payments for volume decreases for certain hospitals, and payments for extremely costly cases (known as "Outlier" payments).

16.     Part B, the supplementary medical insurance program, pays for various "medical and other health services" not covered by Part A, including hospital outpatient services. 42 U.S.C. §§ 1395j *et seq*.  In 2000, CMS implemented the outpatient prospective payment system ("OPPS"), as authorized by Congress in the Balanced Budget Act of 1997.  In most cases, payment to hospitals under the OPPS is based on the ambulatory payment classification ("APC") of the service provided, which is analogous to the inpatient DRG.  42 U.S.C. § 419.31.

17.     Whether hospital services provided to a Medicare beneficiary are billed under Part A or Part B is determined by whether the beneficiary is admitted as an inpatient or outpatient.

18.     CMS pays providers participating in the Medicare Program for covered services rendered to Medicare beneficiaries through administrative contractors. 42 U.S.C. § 1395h.  The amount of the payment to a provider for services furnished to Medicare beneficiaries is determined by the hospital's Medicare administrative contractor acting as an agent of the Secretary. 42 U.S.C. § 1395h.

## THE TWO-MIDNIGHT POLICY AND THE 0.2% PAYMENT REDUCTION

19.     Since the beginning of Medicare, CMS and its predecessors defined an inpatient as a patient "formally admitted as inpatient with the expectation that he or she will remain at least overnight and occupy a bed even though it later develops that the patient can be discharged or transferred to another hospital and not actually use a hospital bed overnight."  Medicare Benefit Policy Manual (CMS Pub. 100-02), Chapter 1, § 10.  CMS acknowledges that the decision to admit a patient as an inpatient is a "complex medical judgment which can be made only after the physician has considered a number of factors." *Id.*

20.     CMS determined that the inpatient admission guidelines required clarification, and developed a new standard in the FFY 2014 rulemaking.  Under the new rule, there is a presumption that inpatient admissions (which are paid under Medicare Part A) are reasonable and necessary for Medicare beneficiaries who require more than one Medicare utilization day, defined as crossing two midnights of medically necessary inpatient hospital services.  This is referred to as the "two-midnight" policy.  78 Fed. Reg. at 50,944-49; 42 C.F.R. § 412.3(e)(1). Under the two-midnight policy, hospital services spanning less than two midnights are considered outpatient services (which are paid under Medicare Part B) unless: (1) the medical record contains clear documentation supporting the physician's order and expectation that the beneficiary would require care beyond two midnights but that two- midnight stay is not realized, (2) the services are designated by CMS as "inpatient only," or (3) unspecified "rare and unusual circumstances" when second night stay is not expected, but is appropriate for inpatient admission. 78 Fed. Reg. at 50,946; 42 C.F.R. § 412.3(e)(1).

21.     The FFY 2014 IPPS Proposed Rule (the "Proposed Rule") states that CMS actuaries estimated that the two-midnight policy would shift 400,000 encounters from outpatient to inpatient, and 360,000 encounters from inpatient to outpatient, for a net shift (increase) of

40,000 inpatient admissions.  78 Fed. Reg. 27,486, 27,649 (May 10, 2013).  CMS estimated that

the shift would cost the Medicare program an additional $220,000,000.  *Id*.  To offset the

predicted increase, the Secretary used her alleged "exceptions and adjustments authority" under

42 U.S.C. § 1395ww(d)(5)(I)(i) to institute a 0.2% reduction for the standardized amount, the

hospital-specific rates, and the Puerto Rico-specific standardized amount for all IPPS hospitals.

*Id*.  In the Proposed Rule, CMS provided no data, calculations, or even a description of the

method its actuaries used to make these estimates.

22.     Following the Proposed Rule, more than 630 comments were submitted regarding

the Proposed Rule, a number of which involved the 0.2% reduction.  The commenters opposed

the reduction.  Some disputed the findings based on their own calculations, noting that CMS

refused to release any actuarial data, despite requests for such information.  In fact, some

commenters described models showing that the result of the new "two-midnight" policy

produced a net increase in *outpatient* encounters, which would lead to a net decrease in payment

to providers, the exact opposite of CMS's predictions.

23.     In the Final Rule, CMS adopted the 0.2% reduction.  78 Fed. Reg. at 50,952-54.

In the Final Rule, CMS acknowledged that commenters opposed the reduction, and  complained

about the lack of actuarial data and methodologies.  78 Fed. Reg. at 50,953.  CMS summarily

dismissed these comments as unfounded, while continuing to withhold the data, calculations, and

methodology used by its actuaries, explaining their estimates only in vague terms.  78 Fed. Reg.

at 50,953-54.  Of the little bit of detail CMS did publish, CMS explained that in determining the

estimate of the number of encounters that would shift from outpatient to inpatient, their actuaries

examined outpatient claims for observation and major procedures, while in determining the

estimate of the number of encounters that would shift from inpatient to outpatient, their actuaries

examined inpatient claims containing a surgical DRGs, but not non-surgical DRGs.  78 Fed. Reg. at 50,953.  Non-surgical cases outnumber surgical cases by two to one.  Neither the proposed or final 2014 rule explains why a trend in surgical cases moving from the outpatient to the inpatient category could be applied to non-surgical cases.

24.     Since adopting the Final Rule, CMS has issued numerous clarifications on the two-midnight policy, including "Frequently Asked Questions" ("FAQs"), alerts, bulletins, "open door forums," and other sub-regulatory guidance.  Confusion over the two-midnight policy has been so great that CMS has instructed its administrative contractors to perform "probe and educate" audits for compliance with the two-midnight policy for the first two years the policy is in effect, and also instructed its recovery audit contractors to not conduct pre-payment patient status reviews for compliance with the two-midnight policy for the first two years the policy is in effect.

25.     In a related consolidated action also challenging the 0.2% Reduction,  this Court recently ruled that the rulemaking promulgating the reduction had serious procedural flaws in violation of the Administrative Procedure Act ("APA").  *Shands Jacksonville Medical Center v. Burwell*, No. 14-cv-00263, Mem. Op. at 33 (D.D.C. Sept. 21, 2015).  Specifically, this Court found that the Secretary deprived the public of an opportunity for meaningful notice and comment on the 0.2% reduction by failing to disclose critical aspects and assumptions of the methodology that CMS used to calculate the expected net increase in the number of inpatient admissions until after the comment period.  *Id*. at 36.  This Court in *Shands* remanded the FFY 2014 rulemaking to CMS for repromulgation of the rule and a new comment and response period.  *Id*. at 50.

## THE MEDICARE APPEALS PROCESS

26.     A hospital is entitled to a Provider Reimbursement Review Board ("PRRB")

hearing if the hospital is dissatisfied with a final determination as to the amount of the payment

under subsections (b) or (d) of 42 U.S.C. § 1395ww, and meets the other requirements set forth

in  42 U.S.C §1395oo(a).

27.     If a hospital's jurisdictionally-proper appeal involves a question of law that the

PRRB is without authority to decide, the PRRB may, through its own motion or upon the request

of the hospital, grant expedited judicial review ("EJR") of the appeal.  42 U.S.C § 1395oo(f)(1).

If EJR is granted, a hospital may seek judicial review of the final determination without a PRRB

hearing.  42 U.S.C § 1395oo(f)(1).

28.     Under 42 C.F.R. § 405.1867, the PRRB is required to comply with all policies

issued by the Secretary under the Social Security Act.  *See Sarasota Mem'l Hosp. v. Shalala*, 60

F.3d 1507, 1509-10 (11th Cir. 1995) (noting the PRRB's recognition that EJR was granted

because the Board is bound by Medicare regulations as well as IPPS rate adjustment factors).

## THE ADMINISTRATIVE PROCEDURE ACT

29.     Under the APA, a "reviewing court shall… hold unlawful and set aside agency

action, findings, and conclusions found to be… arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Furthermore, a "reviewing court

shall… hold unlawful and set aside agency action, findings, and conclusions found to be… in

excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C.

§ 706(2)(C).

30.     Additionally, a "reviewing court shall… hold unlawful and set aside agency

action, findings, and conclusions found to be… without observance of procedure required by

law."  5 U.S.C. § 706(2)(D).  The APA dictates rulemaking procedural requirements, specifically

the requirement that the agency provides notice of proposed rulemaking, that the agency affords interested parties an opportunity to comment on the proposed rulemaking, and that the agency considers the relevant matters presented.  5 U.S.C. § 553.

## PROCEDURAL BACKGROUND

31.     This action arises from a PRRB group appeal challenging the 0.2% payment reduction.  Each of the Providers appealed the payment reduction that was published in the Final Rule by filing timely and jurisdictionally valid appeals in accordance with 42 U.S.C. § 1395oo.

32.      By letter dated June 1, 2015, the PRRB notified the Providers that it was considering issuing a decision regarding EJR on its own motion.

33.     By letter dated August 3, 2015, received by Providers' group representative on August 11, 2015, the PRRB granted EJR on its own motion, determining that it lacked jurisdiction to resolve the issue presented on appeal.  A copy of this letter is attached as Exhibit 2.  This action is timely-filed under 42 U.S.C. § 1395oo(f).

## INVALIDITY OF THE SECRETARY'S DECISION

34.     The Secretary's 0.2% reimbursement reduction is invalid because it (a) is inconsistent with, and unauthorized by, the governing Medicare statute, regulations, and manual provisions, (b) is arbitrary, capricious, and not based on substantial evidence, (c) was improperly promulgated under the APA, and (d) is otherwise defective both procedurally and substantively.

**1.     THE SECRETARY LACKS THE STATUTORY AUTHORITY TO APPLY THE 0.2% REDUCTION**

     **a.     The Medicare Act Does Not Provide for the 0.2% Reduction**

35.     The Secretary lacks the statutory authority to impose the 0.2% reduction because she has no authority under the statute to impose across the board payment reductions and not in the form she used here.  Moreover, the 0.2% reduction violates Medicare statutes and regulations

that require precise reimbursement methodologies.  Provisions of the Medicare statute and

regulations (*e.g.,* 42 U.S.C. §§ 1395ww(d)(1), (3), (5)(D), and (5)(G), and 42 C.F.R.

§§ 412.308(c)(1)(ii) and 412.312(b)(3)) specifically state the calculation of the standardized

amount for operating costs, the hospital-specific rates for sole community and Medicare-

dependent hospitals, and the Federal rate for capital costs.  These statutes and regulations do not

permit the Secretary to impose an across-the-board 0.2% inpatient payment reduction to all

inpatient claims.  Thus, the 0.2% reduction disregards these mandatory provisions, exceeding the

Secretary's statutory authority.

### b.      Section 1395ww(d)(5)(I)(i) Does Not Create a Broad Exception Allowing for the 0.2% Reduction

36.     The use of 42 U.S.C. § 1395ww(d)(5)(I)(i) for a global rate reduction is an

unexplained departure from the Secretary's prior interpretation of this provision, and does not fit

within the language, structure, or intent of the statute.  The preceding clauses in 42 U.S.C.

§ 1395ww(d)(5) identify distinct exceptions and adjustments to be applied in very specific

circumstances, such as outlier cases, hospitals with indirect costs of medical education, and

regional and national referral centers.  In context of the statute as a whole, 42 U.S.C.

§ 1395ww(d)(5)(I)(i) does not convey sweeping authority for the Secretary to apply across-the-

board rate reductions but, rather, only reductions of the kind similar to what appears in the

preceding clauses.

### c.      The 0.2% Reduction is Inconsistent with the Structure and Intent of IPPS

37.     The application of a "budget neutrality" adjustment to a policy-induced volume

increase violates the basic structure and policy of IPPS, and effectively leaves providers

uncompensated for medically necessary covered services provided to beneficiaries.  IPPS already

contains mechanisms to adjust for variations in volume and case mix from year to year.  The

ostensible purpose of the two-midnight policy is to attempt to create a better method to

accurately categorize hospital short stay admissions as inpatient or outpatient.  The Secretary has

stated that the new two-midnight policy will result in a net increase in inpatient admissions.  If

this is so, then hospitals have been previously under-admitting patients as inpatients, and the

two-midnight policy is intended to correct this.  These increased inpatient admissions are

considered by the Secretary, under the two-midnight policy, to be medically necessary inpatient

admissions.  And yet, the 0.2% reduction offsets the amounts hospitals should be receiving for

these new inpatient admissions.  The effect of this adjustment is that these allegedly "new"

inpatient admissions are unreimbursed, which violates, *inter alia*, the prohibition on cross-

subsidization under 42 U.S.C. § 1395x(v)(1)(a), that is, Medicare is prohibited from underpaying

for its claims causing those unreimbursed costs to be shifted to other payers.

38.     Equally arbitrary and capricious is that the 0.2% reduction is being applied

without CMS or its Medicare administrative contractors being able to correct or adjust it, either

on a hospital level or program-wide level basis.  For instance, a particular hospital may not see a

single additional inpatient admission under the two-midnight policy, but is still subject to the

global rate reduction.  Also, the Secretary's overall forecasts may be wrong, and the two-

midnight policy may result in a smaller net inpatient admission increase than predicted, or may

even result in a net *decrease* in inpatient admissions, but there is no method to compensate

providers for these errors.  The reduction likely will have further unintended consequences, such

as reducing the outlier pool. The structure of IPPS, and the potential unreasonable consequences

of the 0.2% reductions, show that § 1395ww(d)(5)(I)(i) was not intended to be used to make

global adjustments to account for estimated changes in volume, which is precisely the purpose it

is being used for here.

> **d.**      **The 0.2% Reduction was Implemented in Further Violation of the Medicare Act**

39.      Section 1395ww(d)(5)(I)(i) requires adjustments made under this exception to be "provide[d] by regulation."  Similarly, 42 U.S.C. § 1395hh(a) requires that "[n]o rule, requirement, or other statement of policy… that establishes or changes a substantive legal standard governing… the payment for service… shall take effect unless it is promulgated by the Secretary by regulation…."  The Secretary did not promulgate a regulation to effectuate the 0.2% reduction, but merely applied it as a rate adjustment in the preamble to the Final Rule.  As explained above, the Secretary lacks the statutory authority to implement the 0.2% reduction under applicable Medicare statutes.  However, even if the Secretary had the authority to implement the 0.2% reduction, it was implemented in a way that violates the statutory requirements of its allegedly authorizing statute (and others) and therefore is invalid.[1]

**2.      THE 0.2% REDUCTION VIOLATES THE APA AND THE MEDICARE ACT**

40.      In light of the FFY 2014 IPPS Proposed and Final Rules, and the approximately 630 comments that were submitted in response to the Proposed Rule, it is clear that the 0.2% reduction violates the rulemaking requirements under 5 U.S.C. § 553 of the APA, and the Medicare statute, 42 U.S.C. § 1395hh, and is arbitrary, capricious, not based on substantial evidence and otherwise inconsistent with law.

---

[1] The court presiding over the *Shands* case, *supra*, rejected the arguments from the plaintiffs in that matter that the 0.2% Reduction was not authorized by, and is otherwise inconsistent with, particular provisions and the overall structure of the Medicare Act.  Respectfully, as components of a decision from a United States district court, the conclusions reached in *Shands* on these issues do not constitute binding precedent (*Camreta v. Greene*, 131 S. Ct. 2020, 2033 n.7 (2011)) and are incorrect in any event.  Plaintiffs therefore maintain, and allege herein, that the 0.2% Reduction is invalid under the Medicare Act, notwithstanding the *Shands* decision.

### a. The Secretary Failed to Provide Pertinent Data and Methodologies in the Proposed Rule

41.     In the Proposed Rule, CMS failed to provide the data, actuary studies, assumptions and calculations that led to the conclusion that the two-midnight policy would increase IPPS expenditures due to net increased inpatient admissions.  Some commenters noted that they requested such information during the comment period, and were denied.  Furthermore, some commenters asserted that they could not recreate CMS's predictions.  Without providing such data and methodologies in the Proposed Rule, the Secretary did not provide meaningful notice to those affected by the rule change and thus denied the public an opportunity for meaningful comment regarding the proposed payment reduction.

### b. The Secretary Improperly Excluded Non-Surgical Cases in its Calculations

42.     CMS states in the Final Rule in support of the payment reduction that its predictions of how many cases would shift from inpatient to outpatient relied solely on surgical admissions data, and excluded non-surgical admissions (*i.e.*, hospital admissions not related to a surgery and referred to as medical cases).  78 Fed. Reg. at 50,953.  However, the two-midnight policy applies both to surgical and medical cases.  It is *ipse facto* arbitrary and capricious for CMS to exclude non-surgical cases from its projections but then apply the two-midnight policy to such cases, and CMS provided no reason for doing so.  Not only is this a major methodological error in calculating the predicted net effect of the two-midnight policy, but by not releasing this information in the Proposed Rule, the public did not have notice of, nor the opportunity to provide meaningful comment on, the unreasonably broad use of this limited data.

### c. The Secretary Improperly Used Inconsistent Methodologies

43.     CMS states in the Final Rule that in calculating the predicted shift from outpatient

to inpatient admissions, it examined "outpatient claims for observation or major procedures."  78

Fed. Reg. at 50,953.  In other words, to calculate the shift from outpatient to inpatient, CMS

included observation outpatient cases, which are most analogous to medical inpatient cases

(which had been excluded from the inpatient shift calculations).  There is no logical reason for

CMS to have treated the outpatient shift predictions differently than the inpatient shift

predictions.  The Providers believe that the inconsistent treatment of the two predictions likely

led the Secretary to overestimate the shift from outpatient to inpatient, and underestimate the

shift from inpatient to outpatient, thereby making the 0.2% reduction arbitrary and capricious.

Furthermore, without providing a description of these calculation methodologies in the Proposed

Rule, the Secretary did not provide meaningful notice or opportunity for comment.

> ### d.     The Secretary Failed to Adequately Explain the Reasoning for the Reduction

44.     Under the APA, the Secretary is prohibited from taking actions and making

findings and conclusions that are arbitrary and capricious, and conduct is considered arbitrary

and capricious when it is not explained, or when it is not rationally explained.  5 U.S.C.

§ 706(2)(A).  As such, when the Secretary implements a provision of the Act, she must

sufficiently explain the reasons for the choices she makes in such implementation.  In setting

forth the 0.2% reduction, the Secretary failed to adequately explain, or explain at all, and provide

the data, methodologies, assumptions and calculations that led to the 0.2% reduction.  In both the

Proposed and Final Rules, the Secretary did not show how the 0.2% reduction was formulated.

45.     Numerous comments submitted in response to the Proposed Rule noted the lack

of available data and explanations, and questioned the Secretary's findings and conclusions.  In

the Final Rule, the Secretary continued to withhold the data and methodology behind the 0.2%

reduction.  The Final Rule also failed to sufficiently address commenters' questions and

concerns.  As such, the Secretary's actions in establishing the 0.2% reduction are arbitrary and capricious.

> **e.     The Post-Rule Guidance Shows that the Secretary Could Not Have Been Able to Accurately Predict the Effects of Implementing the 0.2% Reduction**

46.     The two-midnight policy itself, independent of the related 0.2% reduction, has caused vast uncertainty and confusion among the provider community.  Since the promulgation of the two-midnight policy, CMS has issued numerous updates, guidance documents and provider education programs.  In issuing this post-Final Rule guidance, CMS is obviously still working out the details of the two-midnight policy.  The current lack of clarity regarding the operation of the two-midnight policy, as evidenced by the post-Final Rule guidance, shows that CMS could not have known how it was going to apply the policy prior to the issuance of the Final Rule.  Therefore, CMS could not have accurately, or even reasonably, estimated the impact of the policy on IPPS payments so as to properly calculate a factor in any direction, positive or negative.  As such, the 0.2% reduction is arbitrary and capricious.

> **f.     There Is No Mechanism to Adjust the Payment Reduction if the Secretary's Assumptions Upon Which It is Based Prove to Be Inaccurate, Which Renders the Policy Unreasonable**

47.     The 0.2% payment reduction is based on the Secretary's assumption that, due to the two-midnight policy, provider behavior will change and lead to an aggregate increase in IPPS payments.  But, there is no mechanism for the Secretary to alter or adjust the 0.2% reduction if these assumptions and projections prove to be inaccurate.  It is arbitrary and capricious for the Secretary to adopt a policy that purportedly accounts for anticipated behavioral changes without having some methodology for correcting the reduction if those anticipated changes do not occur, particularly when the payment reduction, as discussed above, is based on a flawed data and

analysis.  Moreover, the lack of any mechanism for adjusting the payment reduction based on actual data concerning provider behavior is inconsistent with how the Secretary has before carried out similar "behavioral adjustments."

## CAUSES OF ACTION

### COUNT I:
### Violation of the Administrative Procedure Act
### (The Secretary Lacks the Statutory Authority to Apply the 0.2% Reduction)

48.     Plaintiffs repeat and reallege paragraphs 1-47 as if set forth fully herein.

49.     The APA prohibits the Secretary from implementing the Medicare Act via actions, findings or conclusions that are in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.  5 U.S.C. § 706(2).

50.     The Secretary lacks the statutory authority to apply the 0.2% reduction.  The Medicare Act and regulations prescribe precise payment methodologies under IPPS.

51.     The exception contained within 42 U.S.C. § 1395ww(d)(5)(I)(i) does not provide sweeping authority for the Secretary to apply an across-the-board 0.2% inpatient payment reduction.

52.     The basic structure and policy of IPPS does not allow for the application of a "budget neutrality" adjustment to a policy-induced volume increase.

53.     The 0.2% reduction does not allow CMS or its administrative contractors to correct or adjust the rate reduction, either on a hospital level or program-wide level basis, in case the predictions are incorrect.  The structure of IPPS, and the potential unreasonable consequences of the 0.2% reductions, show that § 1395ww(d)(5)(I)(i) was not intended to be used to make global adjustments to account for estimated changes in volume.  Therefore, in implementing the 0.2% reduction, the Secretary exceeded her statutory authority.

**COUNT II:**
**Violation of the Administrative Procedure Act**
**(The 0.2% Reduction is Arbitrary and Capricious Because the Secretary Failed to Provide Pertinent Data and Methodologies)**

54.     Plaintiffs repeat and reallege paragraphs 1-47 as if set forth fully herein.

55.     The APA prohibits the Secretary from implementing the Medicare Act via actions, findings or conclusions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2).

56.     In the Proposed Rule, CMS failed to provide the data, actuary studies, assumptions and calculations that led to the conclusion that the two-midnight policy would increase IPPS expenditures due to net increased inpatient admissions.

57.     Despite requests for such information, and comments criticizing the failure to publish this information, in the Final Rule, CMS continued to withhold the data, actuary studies, assumptions and calculations that led to the conclusion that the two-midnight policy would increase IPPS expenditures due to net increased inpatient admissions.

58.     Without properly explaining the data, actuary studies, assumptions and calculations that led to the conclusion that the two-midnight policy would increase IPPS expenditures due to net increased inpatient admissions, CMS's 0.2% reduction policy is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

**COUNT III:**
**Violation of the Administrative Procedure Act**
**(The 0.2% Reduction is Arbitrary and Capricious Because the Secretary Improperly Excluded Medical Cases in its Calculations)**

59.     Plaintiffs repeat and reallege paragraphs 1-47 as if set forth fully herein.

60.     The APA prohibits the Secretary from implementing the Medicare Act via actions, findings or conclusions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2).

61.     Of the little information CMS did publish in the Final Rule regarding its

calculation, CMS mentioned that its predictions of how many cases would shift from inpatient to

outpatient relied solely on surgical admissions data, and excluded the larger group of non-

surgical medical cases.

62.     The two-midnight policy applies to both surgical and non-surgical cases.  It is

arbitrary and capricious for CMS to exclude non-surgical cases from its projections but then

apply the reduction to such cases.  Additionally, CMS did not adequately explain or support its

decision to exclude medical cases from the calculation.  As such, the 0.2% reduction is arbitrary,

capricious, an abuse of discretion, and otherwise not in accordance with law.

**COUNT IV:**
**Violation of the Administrative Procedure Act**
**(The 0.2% Reduction is Arbitrary and Capricious Because the Secretary Improperly Used**
**Inconsistent Methodologies)**

63.     Plaintiffs repeat and reallege paragraphs 1-47 as if set forth fully herein.

64.     The APA prohibits the Secretary from implementing the Medicare Act via

actions, findings or conclusions that are arbitrary, capricious, an abuse of discretion, or otherwise

not in accordance with law.  5 U.S.C. § 706(2).

65.     Although CMS provided very little information about how it reached its

calculations, it did mention that, in its predictions of how many cases would shift from outpatient

to inpatient, it examined outpatient claims for observation and major procedures.  In other words,

in calculating the shift from, inpatient to outpatient, CMS excluded medical cases, but in

calculating the shift from outpatient to inpatient, CMS included outpatient observation claims,

which are analogous to medical inpatient claims.

66.     There is no logical reason for CMS to have treated the outpatient shift predictions

differently than the inpatient shift predictions, and CMS did not provide an explanation.  As

such, the 0.2% reductions is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

## COUNT V:
### Violation of the Administrative Procedure Act
**(The 0.2% Reduction is Arbitrary and Capricious Because the Secretary Failed to Adequately Explain the Reasoning for the Reduction)**

67.     Plaintiffs repeat and reallege paragraphs 1-47 as if set forth fully herein.

68.     The APA prohibits the Secretary from implementing the Medicare Act via actions, findings or conclusions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2).  Conduct is considered arbitrary and capricious when it is not explained, or when it is not rationally explained.

69.     In setting forth the 0.2% reduction, the Secretary failed to adequately explain and provide the data, methodologies, assumptions and calculations that led to the 0.2% reduction. The Final Rule also failed to adequately address commenters' questions and concerns. As such, the 0.2% reduction is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

## COUNT VI:
### Violation of the Administrative Procedure Act
**(The 0.2% Reduction is Arbitrary and Capricious Because the Post-Rule Guidance Shows that the Secretary Could Not Have Been Able to Accurately Predict the Effects of Implementing the 0.2% Reduction)**

70.     Plaintiffs repeat and reallege paragraphs 1-47 as if set forth fully herein.

71.     The APA prohibits the Secretary from implementing the Medicare Act via actions, findings or conclusions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2).

72.     Since the promulgation of the two-midnight policy, CMS has issued numerous updates, guidance documents and provider education programs explaining and clarifying the

application of the two-midnight policy.  The current lack of clarity regarding the operation of the two-midnight policy, as evidenced by the post-Final Rule guidance, shows that CMS could not have known how it was going to apply the policy prior to the issuance of the Final Rule. Therefore, CMS could not have accurately, or even reasonably, estimated the impact of the policy on IPPS payments so as to properly calculate a factor in any direction, positive or negative.  As such, the 0.2% reduction is arbitrary and capricious.

**COUNT VII:**
**Violation of the Administrative Procedure Act**
**(The 0.2% Reduction is Arbitrary and Capricious Because There is No Mechanism to Adjust the Payment Reduction if the Secretary's Assumptions Upon Which it is Based Prove to be Inaccurate)**

73.     Plaintiffs repeat and reallege paragraphs 1-47 as if set forth fully herein.

74.     The APA prohibits the Secretary from implementing the Medicare Act via actions, findings or conclusions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2).

75.     The 0.2% reduction does not allow CMS or its administrative contractors to correct or adjust the reduction, either on a hospital level or program-wide level basis, in case the predictions are incorrect.  It is arbitrary, capricious and an abuse of discretion for CMS to implement a 0.2% reimbursement reduction based on flimsy predictions, and not incorporate a mechanism to adjust the reduction should the predictions not be accurate.

**COUNT VIII:**
**Violation of the Administrative Procedure Act**
**(The Secretary Failed to Comply with Notice and Comment Procedures)**

76.     Plaintiffs repeat and reallege paragraphs 1-47 as if set forth fully herein.

77.     The APA requires the Secretary to observe procedure required by law, and to follow proper rulemaking procedures, including notice and comment requirements.  5 U.S.C. § 706(2)(D); 5 U.S.C. § 553.

78.     In the Proposed Rule, CMS failed to provide the data, actuary studies, assumptions, calculations or specific methodologies that led to the conclusion that the two-midnight policy would increase IPPS expenditures due to net increased inpatient admissions. Some commenters stated that they could not recreate CMS's predictions, and some commenters noted that they requested such information during the comment period, and were denied. Without providing such data and methodologies in the Proposed Rule, the Secretary did not provide meaningful notice to the public, and therefore denied interested parties an opportunity for meaningful comment.

### COUNT IX:
### Violation of the Administrative Procedure Act
### (The Secretary Exceeded Statutory Authority Because the 0.2% Reduction was Not Promulgated as a Regulation)

79.     Plaintiffs repeat and reallege paragraphs 1-47 as if set forth fully herein.

80.     The APA prohibits the Secretary from implementing the Medicare Act via actions, findings or conclusions that in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.  5 U.S.C. § 706(2).

81.     42 U.S.C. § 1395ww(d)(5)(I)(i) requires adjustments made under this exception to be "provide[d] by regulation."  Similarly, 42 U.S.C. § 1395hh(a) prohibits any rule or policy that establishes or changes a substantive legal standard governing the payment for service, unless it is promulgated by the Secretary by regulation.

82.     The Secretary did not promulgate a regulation to effectuate the 0.2% reduction, but merely applied it as a rate adjustment as published in the preamble to the Final Rule. Accordingly, the 0.2% reduction violates the express terms of 42 U.S.C. § 1395ww(d)(5)(I)(i) and 42 U.S.C. § 1395hh(a), thereby violating the APA.

**COUNT X:**
**Violation of the Medicare Act**
**(The Secretary Violated Express Statutory Terms Because the 0.2% Reduction was Not**
**Promulgated as a Regulation)**

83.     Plaintiffs repeat and reallege paragraphs 1-47 as if set forth fully herein.

84.     42 U.S.C. § 1395ww(d)(5)(I)(i) requires adjustments made under this exception to

be "provide[d] by regulation."  Similarly, 42 U.S.C. § 1395hh(a) prohibits any rule or policy that

establishes or changes a substantive legal standard governing the payment for service, unless it is

promulgated by the Secretary by regulation.

85.     The Secretary did not promulgate a regulation to effectuate the 0.2% reduction,

but merely applied it as a rate adjustment, thereby violating the express terms of the Medicare

Act.

**COUNT XI:**
**Mandamus**

86.     Plaintiffs repeat and reallege paragraphs 1-47 as if set forth fully herein.

87.     The Secretary has the non-discretionary duty to reimburse Providers fully at the

amounts to which they are entitled under the law.  The 0.2% reduction violates the Medicare Act

and Administrative Procedure Act.  Under the Court's authority pursuant to 28 U.S.C. § 1361,

the Providers are entitled to issuance of a writ of mandamus under the Medicare Act and other

authority requiring the Secretary to order the Providers' Medicare administrative contractors, or

their successors in interest, to make new determinations for the fiscal years at issue in this case

without applying the 0.2% reduction.

**COUNT XII:**
**All Writs Act**

88.     Plaintiffs repeat and reallege paragraphs 1-47 as if set forth fully herein.

89.     The Secretary has violated the Medicare Act and Administrative Procedure Act in

implementing the 0.2% reduction.  The Providers are entitled to their full payment under IPPS, without the 0.2% reduction.  Under the All Writs Act, 28 U.S.C. §1651, and other authority, the Providers are entitled to issuance of an order requiring the Secretary to order the Providers' Medicare administrative contractors, or their successors in interest, to make new determinations for the fiscal years at issue in this case.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

1.      For an Order:

(a) declaring the 0.2% reduction to be invalid;

(b) setting aside the portion of the Final Rule setting forth the 0.2% reduction;

(c) requiring the Secretary to order the Plaintiffs' Medicare administrative contractors to make FFY 2014 and future IPPS payments to the Plaintiffs without applying the 0.2% reduction to the standardized amount and hospital-specific rates for operating costs;

(d) requiring the Secretary to order the Plaintiffs' Medicare administrative contractors to make FFY 2014 and future IPPS payments to the Plaintiffs with appropriate increases;

(e) directing the Secretary to pay Plaintiffs interest pursuant to 42 U.S.C. § 1395oo(f)(2); and

(f) directing the Secretary to pay Plaintiffs for legal fees and other costs of suit; and

2.      For such other and further relief as the Court deems appropriate.

DATED:  October 1, 2015                    Respectfully submitted,

                                           HOOPER, LUNDY & BOOKMAN, P.C.


                                            /s/ Kelly A. Carroll
                                           Kelly A. Carroll, Esq. (D.C. Bar No. 1018485)
                                           HOOPER, LUNDY & BOOKMAN, P.C.
                                           401 9th Street, NW, Suite 550
                                           Washington, D.C. 20004
                                           Phone:  (202) 580-7700
                                           Fax:  (202) 580-7719
                                           Email:  kcarroll@health-law.com

                                           Jordan B. Keville, Esq. (Cal. Bar No. 217868)
                                           HOOPER, LUNDY & BOOKMAN, P.C.
                                           1875 Century Park East, Suite 1600
                                           Los Angeles, California 90067
                                           Phone: (310) 551-8111
                                           Fax: (310) 551-8181
                                           Email: jkeville@health-law.com

                                           *Attorneys of Record for All Plaintiffs*